

FILED
CLERK, U.S. DISTRICT COURT

JUN 11 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___RS___ DEPUTY

Evgenia Quaid, Pro Se
Randy Quaid, Pro Se
7600 Chevy Chase Drive
Chase Park, Suite 300, Quaid Films
Austin, TX, 78752
802-453-7250
eliza.George@Mail.be

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**2:21-CV-04793-CBM-JPRx**

| | |
|---|---|
| RANDY QUAID, an individual;<br>EVGENIA QUAID, an individual,<br><br>Plaintiffs<br><br>v.<br><br>BRUCE BERMAN, an individual;<br>and NANCY GOLIGER BERMAN,<br>an individual; R. SCOTT TURICCHI,<br>an individual;<br>LANNETTE C. TURICCHI, an<br>Individual; ALL PERSONS KNOWN<br>AND UNKNOWN, CLAIMING ANY<br>LEGAL OR EQUITABLE RIGHT,<br>TITLE ESTATE, LIEN, OR<br>INTEREST IN THE PROPERTY<br>DESCRIBED IN THE COMPLAINT<br>ADVERSE TO PLAINTIFFS' TITLE,<br> OR ANY CLOUD ON PLAINTIFFS<br>' TITLE THERETO; and DOES ONE<br> through FIFTY, inclusive,<br><br>Defendants | **VERIFIED COMPLAINT FOR**<br><br>**1.   QUIET TITLE**<br><br>**2.   DECLARATORY RELIEF**<br><br>**3.   CANCELLATION OF<br>       INSTRUMENTS**<br><br><br><br><br><br><br><br><br><br><br>File Date: |

Plaintiffs Randy Quaid, an individual, and Evgenia Quaid, an individual, bring this action against defendants Bruce Berman, an individual, and Nancy Goliger Berman, an individual, R. Scott Turicchi, an individual, and Lannette C. Turicchi, an individual, to quiet title, and against those defendants for declaratory relief and cancellation of instruments, and allege as follows:

## JURISDICTION AND VENUE

1.     Jurisdiction is founded on diversity of citizenship pursuant to 28 USC section 1332, based upon the facts more specifically alleged in paragraphs 1 through // below.  The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

2.     Venue lies in this District pursuant to 28 USC section 1391, because the property which is the subject of the underlying action is located in this District, the actions alleged to have occurred took place principally within this District.


## THE PARTIES

3.     Plaintiff Randy Quaid, an individual, and Evgenia Quaid, an individual ("Quaid" or "the Quaids") are not domiciled in the State of California, and, at all times relevant hereto,  residence in the State of Texas.

4.     Plaintiffs are informed and believe, and based upon such information and belief allege that defendant Bruce Berman, an individual, is domiciled in Los Angeles County, California.

5.     Plaintiffs are informed and believe, and based upon such information and belief allege that defendant Nancy Goliger Berman, an individual, is domiciled in Los Angeles County, California.

6.     Plaintiffs are informed and believe, and based upon such information and belief allege that defendants R. Scott Turicchi, an individual, and Lannette C. Turicchi, an individual, are domiciled in Los Angeles County, California.

<u>**ALLEGATIONS COMMON TO AND INCLUDED IN**</u>
<u>**ALL CAUSES OF ACTION**</u>

7.     Plaintiffs, husband and wife, are now, and at all relevant times mentioned herein, the owners as joint tenants of real property (hereinafter the "Quaid Property") commonly known as 1355 East Mountain Drive 93108, located in the City of Montecito, County of Santa Barbara, State of California, and more specifically described as:

That certain tract of land in the County of Santa Barbara, State of California, shown and designated as Parcel "A" on Parcel Map No. 11669 filed December 22, 1972 in Book 11, Page 30 of Parcel Maps in the office of the County Recorder of said County.

APN: 011-050-054.

8.     Plaintiffs Randy Quaid, aka Randall R. Quaid, and Evgenia Quaid,

3

aka Eugenia H Quaid, are individuals who, at all relevant times mentioned herein, are in undisturbed possession of the Quaid Property.

9.     Plaintiffs are informed and believe, and thereon allege, that defendants Bruce Berman, an individual, and Nancy Goliger Berman, an individual, (the "Bermans") are now, and at all relevant times mentioned herein, were individuals residing in the County of Los Angeles, State of California.

10.     Plaintiffs are informed and believe, and thereon allege, that defendants R. Scott Turicchi, and Lannette C. Turicchi, both individuals, (the "Turicchis") are now, and at all relevant times mentioned herein, were individuals residing in the City of Pasadena in the County of Los Angeles, State of California.

11.     The defendants herein named as "all persons unknown claiming legal or equitable right, title estate, lien, or interest in the real property described in the Complaint adverse to Plaintiffs' title/interest, or any cloud upon Plaintiffs' title/ interest thereto, named herein as DOES 1 through 50, inclusive, are unknown to Plaintiff. These unknown Defendants, and each of them, claim some right, title, estate, lien, or interest in the Quaid Property adverse to Plaintiffs' title; and their claims, and each of them, constitute a cloud on Plaintiffs' title to the Quaid Property.

12.     Plaintiffs are informed and believe, and upon such information and belief allege, that they are unaware of the true names or capacities, whether they are individuals or business entities, of Defendant DOES 1 through 50, inclusive, and sues them by such fictitious names. Plaintiffs will seek leave of this Court to insert their true names and capacities once they have been ascertained.

13.     The proper county for the trial of this action is the County of Santa Barbara because the real property described in Paragraph 1 of this complaint is located within this judicial district.

14.     Plaintiffs are the owners in undisturbed possession of the Quaid Property pursuant to a Grant Deed recorded on October 25, 1989, as Instrument No. 89-071461 in the County of Santa Barbara Recorder's Office (hereinafter referred to as the "Quaid Grant Deed"). A certified copy of the Quaid Grant Deed is attached as **Exhibit "A".** A Recorder's Certificate of the Quaid Property's Parcel Map dated April 2, 2021 is also attached hereto as **Exhibit "B"**. "The term undisturbed possession reflects the reference in Sears v. County of Calaveras (1955) 45 Cal.2d 518, 289 P.2d 425 (Sears) to "an owner in exclusive and undisputed possession...." (Id. at p. 521, 289 P.2d 425.) (Salazar v Thomas 236 Cal.App.4th 467 (Cal. Ct. App. 2015).

15.     On January 15, 1992 the Bermans caused to be recorded into the Santa Barbara County Recorder's Office a Grant Deed Instrument No. 92-002539

(hereinafter referred to as the "forged Quaid/Berman Grant Deed"). A certified copy of the forged Quaid/Berman Grant Deed is attached as **Exhibit "C"** hereto.

10. On the same day the Bermans also caused to be recorded into the County records a Deed of Trust Instrument No. 92-002540 (hereinafter the "Berman Deed of Trust"). A certified copy of the Berman Deed of Trust is attached as **Exhibit "D"** hereto.

16.     Both the forged Quaid/Berman Grant Deed and the Berman Deed of Trust are fraudulent instruments. Herein, each instrument in particular and specifically is examined and identified as such.

17.     The forged Quaid/Berman Grant Deed contains signatures alleging to be those of the Plaintiffs; however, the "Randall R. Quaid" and "Eugenia H Quaid" signatures on the document are forged; the signatures are not of the Quaids' own making, nor were the signatures placed on the document at the Quaids' direction. This claim is supported by the findings of highly acclaimed handwriting experts.

18.     The handwriting experts cited herein agree that at least one or both of the Quaids' signatures on the forged Quaid/Berman Grant Deed have been created by someone other than the Quaids. **Exhibit "E"** represents a nine-page report entitled *"EXPERT'S REPORT ON THE EXAMINATION OF THE QUESTIONED 'GRANT DEED' FOR RANDY & EVGENIA QUAID,"* detailing the discrepancies between Randy Quaid's alleged signature on the forged Quaid/Berman Grant Deed

and sixteen specimens of his signature from 1981 through 2009. The author of said report, Douglas A. Cobb, is an internationally renown paper scientist and document analyst. Mr. Cobb's impeccable credentials are summarized in his report as follows:

> I am a Paper Scientist and Forensic Document Examiner. I have been involved in the research, development, production and testing of various grades of paper for over 27 years. I have been involved in the development of testing of paper and print characteristics for Hewlett Packard, Xerox, Canon, Deluxe Check and other companies which are major suppliers of high-quality copy paper and office equipment. I consult and assist Handwriting Experts and forensic document Examiners with examinations related to paper and paper properties. I have presented at many national and international conferences, educating Handwriting Experts and Forensic Document Examiners in the aspects of paper and print properties and how they present clues to forensic analysis.
>
> I have been a Forensic Document Examiner for 13 years. In my forensic document analysis methodology, I follow and abide by the standards developed by professionals in the Forensic Document Examination discipline and guidelines published by the Scientific Association of Forensic Examiners (SAFE). These standards and

*guidelines have bee thoroughly studied through extensive scientific*

*research and validated through rigorous peer review and publication.*

*I've applied the standards and guide lines that are applicable to the*

*document examined in this case (the Quaid/ Berman Grant Deed).*

(Parenthetical added for clarity).

For Mr. Cobb's complete credentials please see **Exhibit "F"** "The CV of

DOUGLAS COBB Paper Scientist and Forensic Document Examiner."

19.    A second handwriting analyst, James Spence, owner and President of

JSA Authentication LLC, specializes in the verification of celebrity and sports

figures' signatures. Mr. Spence analyzed the "Evgenia H Quaid" signature on the

Quaid/Berman Grant Deed and declared it to be a forgery. **Exhibit "G"** represents

the handwriting analysis of JSA Authenticaton LLC.

20.    Taken together, and each separately, the experts' opinions are in

agreement that both of the Quaid signatures on the Quaid/Berman Grant Deed have

been forged.

21.    The forged Quaid/Berman Grant Deed is a void instrument. Therefore

said instrument has no capacity or power to disturb Plaintiffs' possession of the

Quaid Property.

22.    The forged Quaid/Berman Grant Deed is not the only void instrument

in Bermans' chain of recorded documents related to the Quaid property. There is

also the Berman Deed of Trust instrument executed in favor of Crossland Savings,

which purports to stand for a promissory note to lien the Quaid property with a mortgage in the Bermans' name. However, this document is void and has no power of sale. The Parcel Map Number on this document is incorrect and refers to a parcel of real property that does not exist in Santa Barbara County. The true and correct PMN for the Quaid Property is 11669. The PMN indicated on the Berman Deed of Trust is "11,6**99**"; thus, the Berman Deed of Trust identifies no valid real property for which a lender may transfer funds or insure said funds. No consideration was paid to the Quaids by Berman for the Quaid Property.

23.    Additionally, the "Trustee" indicated on the Berman Deed of Trust document, SMS Trust Deed Service, was not in existence in 1992 when the deed was created. The SMS license had expired almost four years earlier. Without a valid trustee the Berman Grant Deed identified no third party to hold and pass title, either to the Trustor upon satisfaction of the debt, or to the Beneficiary upon default. A true and correct copy of the California Bureau of Real Estate license page for SMS Trust Deed Service is attached hereto as **Exhibit "H"**.

24.    Also, the lender identified in the void Berman Deed of Trust, Crossland Savings, FSB, was declared insolvent in the summer of 1991, approximately six months before the deed document was created and recorded in January 1992. Two weeks after the void Berman Deed of Trust was recorded on January 15, 1992 Crossland was put into conservatorship by the FDIC for the purpose of orchestrating a sale of the bank's assets.

9

25.    Both the forged Quaid/Berman Grant Deed and the Berman Deed of

Trust are fraudulent and void instruments with no power to transfer valid title, or to

provide a valid power of sale. **No Berman instrument attached to the Quaid**

**Property has the capacity or the power to disturb the Quaids possession of the**

**Quaid Property.** Therefore the Bermans had no right or legal authority to transfer

the Quaid Property to themselves on January 15, 1992 for their own self-

enrichment. The Bermans acted fraudulently and with malice when they caused to

be forged and recorded into the County records the Quaid/Berman Grant Deed and

the Berman Deed of Trust. Their actions were intentional and willfully done with

the intent to cause economic harm to Plaintiffs while enriching themselves at

Plaintiffs' expense. California caselaw is well settled that an instrument for transfer

of real property, forged and recorded into the public records is a void document

and thus is precluded from delivering good title. *"The recording of a forged deed*

*does not convey title." (People v Sanders (1998); (Firato v. Tuttle, supra, 48 Cal.*

*2d 136, 139; Bryce v. O'Brien, supra, 5 Cal. 2d 615, 616; Trout v. Taylor, supra,*

*220 Cal. 652, 656; Fallon v. Triangle Management Services, Inc., supra, 169 Cal.*

App. 3d 1103, 1105; Wutzke v. Bill Reid Painting Service, Inc., supra, 151 Cal.

App. 3d 36, 43-44.)

26.    And in (Tannhauser v. Adams 31 Cal.2d 169 (Cal. 1947) the Supreme

Court observes, *"It is questionable whether, as to an owner in actual possession of*

*land, the record of a hostile conveyance in the clerk's office is sufficient to set a*

*statute of limitations running against him so as to destroy his title." (Cf. People v.*

*Ladew (1924), 237 N.Y. 413 [ 143 N.E. 238, 243]; People v. Ladew (1907) 189*

*N.Y. 355 [ 82 N.E. 431, 432]; Dunkum v. Maceck Building Corp. (1931), supra,*

*256 N.Y. 275, 286, 287 [ 176 N.E. 392].)*

27.    The Quaids never signed a Purchase Agreement with the Bermans or with any other party to sell the Quaid Property; and the Bermans can produce no valid Purchase Agreement or any other valid escrow document to show that a valid transfer of the Quaid Property to the Bermans ever occurred. Nor did the Quaids ever receive notice regarding an escrow; nor did they participate in an escrow to transfer the Quaid Property to the Bermans or to any other party.

28.    The Bermans, in effect, became Plaintiffs' involuntary trustee of the property, encumbering themselves with the responsibility of paying the County Assessor's tax on behalf of the Quaids. When Berman fraudulently transferred the Quaid Property to the Turicchis in 2007 per a Grant Deed Instrument No. 2007-0060403 (hereinafter the "Berman/Turicchi Grant Deed"), the Bermans also transferred their involuntary trusteeship to the Turicchis, thus encumbering them with the responsibility to pay the Assessor's tax on behalf of the Quaids. A copy of the Turicchi Grant Deed is attached as **Exhibit "I"** hereto. *" . . . [T]he recording of a false deed does not convey title. Nor does the filing of such a deed combined with the redemption of the property by payment of back taxes convey title." (Potter v. County of Los Angeles, supra, 251 Cal. App. 2d 280, 286 [59 Cal. Rptr. 335]; 2*

*Ehrman, Taxing Cal. Property, supra, § 29.17 et seq.; see Rev. & Tax. Code, §*
*4101 et seq.)*

29.    Turicch's "grantor" is identified on the Berman/Turicchi Grant Deed
document as Bruce Berman and Nancy Goliger Berman. The Bermans received
from the Quaids no valid title due to the Bermans' forgery and recordation of the
fraudulent and void Quaid/Berman Grant Deed and the fraudulent and void
Berman Deed of Trust with no power of sale. Berman, therefore, was under no
legal authority or right to transfer the Quaid Property to Turicchi. Thus, Turicchi
received no valid, genuine title from Berman. The Turicchis are thus barred from
achieving status as *bona fide* purchasers of the Quaid Property.

30.    In a letter addressed to the Turicchis dated September 18, 2010,
postmarked and judicially confirmed to have been received by the Turicchis, Quaid
first noticed Turicchi that the Turicchis did not own the Quaid Property,;that they
purchased the Quaid Property from no one who legally owned it; that Quaid "never
sold you the property," "[Y]ou are trespassing," "[Y]ou must vacate immediately."
A true and correct copy of the Quaids' Notice to Turicchi is represented in **Exhibit**
**"J"** and is attached hereto.

31.    Long after first being noticed by the Quaids in 2010 the Turicchis
waited eight years before filing their first official response to the Quaids' letter of
notice in 2018 with not one, but two Quiet Title actions. Both of these actions were
dismissed, dismissed with prejudice. Those two actions were both untimely filed

since the statute of limitations period allowing the Turicchis to respond to the

Quaids ran in September 2013 pursuant to California Civil Code section 338, thus

time-barring the Turicchis from filing any action or claim to the Quaid Property.

The Turicchis' third time-barred and duplicated effort filed here on November 25,

2019 is a vague, anemic pleading supported by no legal basis whatever. Like its

predecessors, the 2019 Turicchi action filed November 25, 2019 is also time barred

according to the statutes, here by six years.

32.     As of the date of Plaintiffs' filing here of their Quiet Title Complaint

no valid instrument has been recorded into the County of Santa Barbara records

with the capacity or force to dispute the power and authenticity of the Quaid Grant

Deed recorded October 25, 1989 or to disturb the Plaintiffs' possession of the

Quaid Property.

<div align="center">

**<u>COUNT ONE</u>**

**<u>TO QUIET TITLE</u>**

</div>

33.     Quaid incorporates by this reference each and every allegation

contained in Paragraphs 1 through 27 of this Complaint as fully as though set forth

at length herein.

34.     *("[A]n instrument wholly void, such as an undeliverable deed, a*

*forged instrument, or a deed in blank, cannot be made the foundation of a good*

*title, even under the equitable doctrine of bona fide purchase."* See *Trout v. Taylor,*

*32 P.2d 968, 970 (Cal. 1934); Green v. MacAdam 175 Cal.App.2d 481 (Cal. Ct.*

*App. 1959)( Promis v. Duke, 208 Cal. 420 [ 281 P. 613]; Gould v. Wise, 97 Cal.*

*532 [32 P. 576, 33 P. 323]; Bardin v. Grace, supra.) ( 167 Ala. 453 [52 So. 425,*

*Ann. Cas. 1912A, 537].) " . . . [I]n line with the great weight of authority, it has*

*been held in this state "that the fraudulent procurement of a deed deposited as an*

*escrow from the depositary by the grantee named therein will not operate to pass*

*the title, and the subsequent purchaser from such grantee, without notice, and for a*

*valuable consideration, derives no title thereby, and will not be protected." (Gould*

*v. Wise, 97 Cal. 532, 536 [32 P. 576, 577, 33 P. 323].)*

35.     The Quaids never relinquished possession of the Quaid Property. They

are the sole owners of record and have been in undisturbed possession of the Quaid

Property since October 25, 1989 pursuant to a Grant Deed being recorded on that

same date in the Recorder's Office in the County of Santa Barbara as Instrument

No. 89-071461 (See Exhibit "A").

36.     *" . . . [Q]uiet title actions have special rules for when the limitations*

*period begins to run. (Salazar v Thomas 236 Cal.App.4th 467 (Cal. Ct. App. 2015).*

*"As a general rule, the statute of limitations [for a quiet title action] does not run*

*against one in possession of land." (Tannhauser v. Adams (1947) 31 Cal.2d 169,*

*175, 187 P.2d 716.)*

37.     *"Recently, the court (The California Supreme Court) stated: "It has*

*long been the law that whether a statute of limitations bars an action to quiet title*

*may turn on whether the plaintiff is in undisturbed possession of the*

*land."" (Parentheses added) (Salazar v Thomas supra, 236 Cal.App.4th 467 (Cal.*

*Ct. App. 2015)); (Mayer, 43 Cal.4th at p. 1237, 78 Cal.Rptr.3d 62, 185 P.3d 43)*

38.     In 1965, California Supreme Court Chief Justice Traynor, citing the

court's decision in Muktarian v Barmby, discussed the general rule that the statute

of limitations for a quiet title action does not run against a party in possession of

the land and identified at least part of the rationale for the limited qualification:

*"[N]o statute of limitations runs against a plaintiff seeking to quiet title while he is*

*in possession of the property. In many instances one in possession would not know*

*of dormant adverse claims of persons not in possession. Moreover, even if, as here,*

*the party in possession knows of such a potential claimant, there is no reason to*

*put him to the expense and inconvenience of litigation until such a claim is pressed*

*against him." (Muktarian, supra, 63 Cal.2d at p. 560, 47 Cal.Rptr. 483, 407 P.2d*

*659, fn. omitted, italics added). Thus, mere notice of an adverse claim is not*

*enough to commence the owner's statute of limitations.*

39.     California statutes and caselaw rulings in the State's highest court

clearly support Quaids' position here that they are in undisturbed possession of the

Quaid Property due to the fact that the fraudulent and forged Quaid/Berman Grant

Deed is a void instrument with no power to transfer good and genuine title to

another party, whether that party be an innocent purchaser or not.

40.     The Quaids are seeking to quiet title against all claims of all

Defendants that are adverse to Quaid in the Property. Said adverse claims are

without any right whatever. Defendants have no right, title, estate, lien, or interest whatever in the Quaid Property adverse to Quaid's title.

41.    The Quaids are in undisturbed possession of the Quaid property and as such are not time barred from taking action to defend their interests in their property. The Plaintiffs are the owners of the Quaid Property and are entitled to possession of the Quaid Property.

42.    The Quaids seeks to quiet title to the Quaid Property as of October 25, 1989, the date Quaid acquired title to the Quaid Property.

<u>**COUNT TWO**</u>

<u>**FOR DECLARATORY RELIEF**</u>

43.    Quaid incorporates by this reference each and every allegation contained in Paragraphs 1 through 37 of this Complaint as fully as though set forth at length herein.

44.    Since October 25, 1989 the Quaids have been in undisturbed possession of the Quaid property. Since that date no valid document or instrument of transfer with the power to transfer from Quaid genuine authentic title to the Quaid property for the benefit of another party has ever been recorded into the Santa Barbara County records.

45.    Since October 25, 1989 no valid document or instrument of transfer with the power to covey the Quaid Property to a *bona fide* third party purchaser has ever been recorded into the Santa Barbara County records.

46.     As the party in undisturbed possession of the Quaid Property Plaintiffs are not time-barred by a statute of limitations to bring an action to defend their title against any and all adverse claims of ownership.

47.     No actual controversy has arisen nor does one exist between Quaid and Turicchi concerning whether or not the Bermans, having received the Quaid Property through fraudulence of their own making, could legally transfer to Turicchi any interest in the Quaid Property; in particular, Quaid desires a judicial determination that the Bermans, having received the Quaid Property through a forged Grant Deed and a void Deed of Trust, were under no authority or power to convey good title to the Turicchis; and that the Bermans do not have, and have never had, an interest in the Quaid Property.

48.     A judicial declaration is necessary and appropriate at this time under the circumstances so that it can be ascertained whether or not the Turicchis, having received the Quaid Property from the Bermans whose fraudulent forged and void instruments had no authority or power to convey said property, achieved status as *bona fide* purchasers of said property.

49.     In particular, Quaid desires a judicial determination, in accordance with California Code of Civil Procedure section 1060, that Berman had no authority to transfer to Turicchi from Quaid an interest in the Quaid Property using a forged Deed.

## **COUNT THREE**

## **CANCELLATION OF INSTRUMENTS**

50.     Quaid incorporates by this reference each and every allegation contained in Paragraphs 1 through 44 of this Complaint as fully as though set forth at length herein.

51.     Plaintiff desires an order for the removal of all Berman and Turicchi instruments and trust documents currently residing in the records of the Santa Barbara County Recorder's Office that relate to the Quaid Property and that all such instruments and documents be cancelled; this includes the Quaid/Berman and Berman/Turicchi Grant Deeds used to allegedly transfer the property from Quaid to Berman and Berman to Turicchi so that no one else may be harmed by their fraudulent, inauthentic nature in the future.

52.     Exhibits E and G, the handwriting experts' reports, concur that one or both of the Quaid signatures on the Quaid/Berman Grant Deed is/are forged, thereby making the document a void instrument to transfer title. The Bermans' and Turicchis' documents represent a cloud on the Quaids' chain of title that has caused irreparable harm to the Quaids and must be removed from the County records.

53.     California law authorizes the cancellation of written instruments if *"there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable[.]"* CAL CIV. CODE § 3412; see *Rockridge Trust v. Wells Fargo, N.A., 985 F. Supp. 2d 1110, 1159 (N.D.*

*Cal. 2013)* ("The Court may order cancellation of an invalid written instrument that is void or voidable.").

54.     The forged Quaid/Berman Grant Deed; and the fraudulent Berman Deed of Trust are void instruments and of no legal effect. *(Trout v. Taylor, supra, (1934))*. Therefore, these documents have no power or capacity to transfer good title from Quaid to Berman or to any third party. These documents must be cancelled.

55. Defendant Berman's transfer of the Quaid Property to the Turicchis relies solely upon the forged Quaid/Berman Grant Deed and the Berman/Turicchi Grant Deed, neither of which provided Berman with the power and authority to transfer good title from Berman to Turicchi in 2007. *"Instruments which are wholly void cannot ordinarily provide the foundation for good title even in the hands of an innocent purchaser, as where a deed has been forged or has not been delivered."* *(Firato v Tuttle, 48 Cal.2d 136, 1957)*. Therefore, the Bermans' and Turicchis' documents in the County records are all void and the Turicchis are not bona fide purchasers and do not possess good title to the Quaid Property.

56.     The forged Quaid/Berman Grant Deed caused Plaintiffs to be seriously harmed, citizen's arrested and forcibly and physically removed from the Quaid Property. The personal, professional, emotional damages and legal consequences done to the Quaids due to the Bermans' recordation of fraudulent

forged and void instruments into the County Recorder's Office is ongoing and severe.

57.     Likewise, all recorded Berman instruments, including Assignments, Substitutions of Trustee and Reconveyance instruments, pertaining to the Quaid Property and emanating from the forged Quaid/Berman Grant Deed and the fraudulent Berman Deed of Trust are likewise void and of no legal effect and must be cancelled.

**WHEREFORE**, Plaintiffs pray judgment against all Defendants, known and unknown, and each of them as follows:

1.     With respect to the First Cause of Action, against all Defendants, that Quaid is the owner of the Quaid Property, and that no Defendant has any interest in the Quaid Property adverse to Quaid;

2.     With respect to the Second Cause of Action, against Berman and Turicchi, for a declaration as to whether the void, forged Quaid/Berman Grant Deed had the power and authority to convey good title to Turicchi; and whether Turicchi has an interest in the Quaid Property; in particular, for a declaration that the Turicchis do not have an interest in the Quaid Property; and a declaration that the Bermans do not have, and have never had, an interest in the Quaid Property, and thus had no authority to transfer the Quaids' title with a forged deed;

3.     With respect to the Third Cause of Action against the Bermans and the Turicchis, for the cancellation of all of their void instruments and trust

deeds related to the Quaid Property so that no one else may be harmed by their fraudulent, inauthentic nature in the future;

4.     For loss of $1.350 million dollars in Quaid Property investment, plus loss of return on investment calculated over 28 years, compounded annually, at an interest rate of 10%, or $21.9 million dollars.

5.     For punitive damages totaling $100 million dollars against Bruce Berman and Nancy Goliger Berman;

6.     For Plaintiffs' costs of suit incurred herein;

7.     For such other and further relief as the Court may deem proper. We verify and declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated:  June 10, 2021                    Randy Quaid, /s/ Randy Quaid, Pro Se

                                                      Evgenia Quaid, /s/ Evgenia Quaid, Pro Se

# EXHIBIT A

# EXHIBIT A

# EXHIBIT A

---

**RESTRICTIVE COVENANT COVER PAGE TO BE ATTACHED TO ALL PUBLIC AND OFFICIAL RECORDS COPIES**

---

12956.1. (a) As used in this section, "association," "governing documents," and "declaration" have the same meanings as set forth in Section 1351 of the Civil Code.

(b) (1) A county recorder, title insurance company, escrow company, real estate broker, real estate agent, or association that provides a copy of a declaration, governing document, or deed to any person shall place a cover page or stamp on the first page of the previously recorded document or documents stating, **in at least 14-point boldface type, the following:**

**"If this document contains any restriction based on race, color, religion, sex, sexual orientation, gender, gender identity, gender expression, genetic information, familial status, marital status, disability, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."**

1493restr.covenant.coversheet.doc

Recording Requested By
First American Title Insurance Co.

Order No.
Escrow No.   SB-1374423-PW
Loan No.

WHEN RECORDED MAIL TO:

Mr. and Mrs. Randall R. Quaid
c/o Goldman, Grant & Tani, Inc.
10960 Wilshire Blvd., #936
Los Angeles, CA 90024

MAIL TAX STATEMENTS TO:

Same Addressee as Above

A.P. 11-050-54

```
89-071461   | Rec Fee      5.00
            | DOC       1485.00
Recorded    | SUR         10.00
Official Records | Total  1500.00
County of   |
Santa Barbara |
Kenneth A Pettit |
Recorder    |
8:00am 25-Oct-89 |            RO   1
```
SPACE ABOVE THIS LINE FOR RECORDER'S USE

DOCUMENTARY TRANSFER TAX $ 1,485.00
XX Computed on the consideration or value of property conveyed; OR
Computed on the consideration or value less liens or encumbrances
remaining at time of sale.

Signature of Declarant or Agent determining tax — Firm Name   FATCO

MONUMENT SURVEY-$10.00

## GRANT DEED

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

MICHAEL JAFFE, a married man as his separate property who acquired title as a single man; and JANN JAFFE, his wife

hereby GRANT(S) to

RANDALL R. QUAID and EUGENIA H. QUAID, husband and wife as joint tenants

the real property in the unincorporated area of the
County of   Santa Barbara                        , State of California, described as

That certain tract of land in the County of Santa Barbara, State of California, shown and designated as Parcel "1" on Parcel Map No. 11669 filed December 22, 1972 in Book 11, Page 30 of Parcel Maps in the office of the County Recorder of said County.

Jann Jaffe, wife of Michael Jaffe joins in the execution of this Grant Deed to acknowledge that the property described herein is the separate property of Michael Jaffe.

Dated   October 20, 1989

STATE OF CALIFORNIA
COUNTY OF Santa Barbara
On   October 21, 1989
before me, the undersigned, a Notary Public in and for said State, personally appeared   MICHAEL JAFFE and JANN JAFFE

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same.

WITNESS my hand and official seal.

Signature

MICHAEL JAFFE
JANN JAFFE

OFFICIAL SEAL
PATRICIA S. WHITE
NOTARY PUBLIC-CALIFORNIA
SANTA BARBARA COUNTY
My Comm. Expires Oct. 3A, 1991

(This area for official notarial seal)

MAIL TAX STATEMENTS AS DIRECTED ABOVE

1002 (6/82)

This is a true certified copy of the original document on file or of record in my office. It bears the seal and signature, imprinted in purple ink of the County Clerk, Recorder and Assessor.

COUNTY CLERK, RECORDER AND ASSESSOR, SANTA BARBARA CALIFORNIA
DATE: AUG 0 5 2015        BY DEPUTY:

# EXHIBIT B

# EXHIBIT B

# EXHIBIT B



# EXHIBIT C

# EXHIBIT C

# EXHIBIT C

<div style="border:1px solid black;">

## RESTRICTIVE COVENANT COVER PAGE TO BE ATTACHED TO ALL PUBLIC AND OFFICIAL RECORDS COPIES

</div>

12956.1. (a) As used in this section, "association," "governing documents," and "declaration" have the same meanings as set forth in Section 1351 of the Civil Code.

(b) (1) A county recorder, title insurance company, escrow company, real estate broker, real estate agent, or association that provides a copy of a declaration, governing document, or deed to any person shall place a cover page or stamp on the first page of the previously recorded document or documents stating, **in at least 14-point boldface type, the following:**

**"If this document contains any restriction based on race, color, religion, sex, sexual orientation, gender, gender identity, gender expression, genetic information, familial status, marital status, disability, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."**

1493restr.covenant.coversheet.doc

RECORDING REQUESTED BY

EQUITY TITLE COMPANY

AND WHEN RECORDED MAIL THIS DEED AND , UNLESS OTHERWISE SHOWN BELOW, MAIL TAX STATEMENTS TO:

```
NAME      BRUCE BERMAN
ADDRESS   7740 FLYNN RANCH ROAD
CITY &    LOS ANGELES, CA  90046
STATE
ZIP
```

Title Order No. _____ Escrow No. ___ 32030-LN

```
92-002539          Rec Fee      5.00
                   SUR         10.00
      Recorded     Total       15.00
Official Records
   County of
Santa Barbara
Kenneth A Pettit
   Recorder
8:00am 15-Jan-92   ETCO   BC   1
```

SPACE ABOVE THIS LINE FOR RECORDER'S USE

APN NO. 011-050-54

# GRANT DEED

MONUMENT SURVEY - $10.00

STAMPS AFFIXED
AFTER RECORDING

The undersigned declares that the documentary transfer tax is $ __ON REVERSE_____ city tax $ _____ and is

☐ computed on the full value of the interest or property conveyed, or is
☐ computed on the full value less the value of liens or encumbrances remaining thereon at the time of sale.  The land, tenements or realty is located in
☒ unincorporated area   ☐ city of _____

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

   RANDALL R. QUAID AND EUGENIA H. QUAID, HUSBAND AND WIFE,

hereby GRANT(S) to   BRUCE BERMAN AND NANCY BERMAN, HUSBAND AND WIFE, AS COMMUNITY PROPERTY,

the following described real property in the   UNINCORPORATED AREA OF THE
county of   SANTA BARBARA                         , state of California:

   THAT CERTAIN TRACT OF LAND IN THE COUNTY OF SANTA BARBARA, STATE OF
   CALIFORNIA, SHOWN AND DESIGNED AS PARCEL "A" ON PARCEL MAP NO. 11669,
   FILED DECEMBER 22, 1972, IN BOOK 11, PAGE 30 OF PARCEL MAPS, IN THE OFFICE
   OF THE COUNTY RECORDER OF SAID COUNTY.

Dated ___NOVEMBER 11, 1991_____

RANDALL R. QUAID

EUGENIA H. QUAID

STATE OF CALIFORNIA
COUNTY OF   LOS ANGELES

On this the __18th__ day of __November__ 19 __91__ , before me,
the undersigned Notary Public,
RANDALL R. QUAID
personally appeared
   AND EUGENIA H. QUAID

☐ personally known to me
☐ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) __ARE__ subscribed to the within
instrument and acknowledged to me that __THEY__ executed the same
in __THEIR__ authorized capacity(ies) and that by __THEIR__ signature(s)
on the instrument the person(s) or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_____
Notary's Signature

FOR NOTARY SEAL OR STAMP

OFFICIAL SEAL
RORI ALYSE FREED
Notary Public - California
SAN DIEGO COUNTY
My Comm. Exp. May 3, 1993

MAIL TAX STATEMENTS TO PARTY SHOWN ON FOLLOWING LINE:  IF NO PARTY SO SHOWN, MAIL AS DIRECTED ABOVE

```
Name              Street Address              City & State
```

ET-137  (Rev. 8-91)

This is a true certified copy of the original document on file or of record in my office. It bears the seal and signature, imprinted in purple ink of the County Clerk, Recorder and Assessor.

COUNTY CLERK, RECORDER AND ASSESSOR, SANTA BARBARA CALIFORNIA

DATE: JUL 3 1 2015    BY DEPUTY: _____

# EXHIBIT D

# EXHIBIT D

# EXHIBIT D

**RESTRICTIVE COVENANT COVER PAGE TO BE ATTACHED TO ALL PUBLIC AND OFFICIAL RECORDS COPIES**

12956.1. (a) As used in this section, "association," "governing documents," and "declaration" have the same meanings as set forth in Section 1351 of the Civil Code.

(b) (1) A county recorder, title insurance company, escrow company, real estate broker, real estate agent, or association that provides a copy of a declaration, governing document, or deed to any person shall place a cover page or stamp on the first page of the previously recorded document or documents stating, **in at least 14-point boldface type, the following:**

**"If this document contains any restriction based on race, color, religion, sex, sexual orientation, gender, gender identity, gender expression, genetic information, familial status, marital status, disability, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."**

1493restr.covenant.coversheet.doc

WHEN RECORDED RETURN TO:

..CrossLand Savings, FSB
  15260 Ventura Blvd, Suite 230
  Sherman Oaks, CA 91403

RECORDING REQUESTED BY

EQUITY TITLE COMPANY

91-32030-50

| | |
|---|---|
| 92-002540 | Rec Fee     32.00 |
|            | Total       32.00 |
| Recorded | |
| Official Records | |
| County of | |
| Santa Barbara | |
| Kenneth A Pettit | |
| Recorder | |
| 8:00am 15-Jan-92 | ETCO    BC   10 |

[Space Above This Line For Recording Data]

# DEED OF TRUST

THIS DEED OF TRUST ("Security Instrument") is made on  JANUARY 8, 1992              . The trustor is
BRUCE BERMAN AND NANCY BERMAN, HUSBAND AND WIFE AS COMMUNITY
PROPERTY.

("Borrower"). The trustee is  SMS Trust Deed Service, A California Corporation

("Trustee"). The beneficiary is  CrossLand Savings, FSB

which is organized and existing under the laws of  THE STATE OF UTAH                     , and whose
address is  860 East 4500 South
Salt Lake City, UT  84107              ("Lender"). Borrower owes Lender the principal sum of
SEVEN HUNDRED SEVENTY THOUSAND AND NO /100
                                              Dollars (U.S. $ 770,000.00          ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for
monthly payments, with the full debt, if not paid earlier, due and payable on  FEBRUARY 1, 2022              .
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals,
extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to
protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this
Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of
sale, the following described property located in  SANTA BARBARA                          County, California:

PARCEL A OF PARCEL MAP NO. 11,699, IN THE COUNTY OF SANTA
BARBARA, STATE OF CALIFORNIA, AS SHOWN ON THE MAP FILED IN
BOOK 11, PAGE 30 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY.

which has the address of  1355 EAST MOUNTAIN DRIVE                  SANTA BARBARA [Street, City],
California    93108                    ("Property Address");
              [Zip Code]

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Page 1 of 8        Form 3005  9/90
    -6R(CA) (9101)            VMP MORTGAGE FORMS - (313)293-8100 - (800)521-7291

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**Form 3005   9/90**

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve

Form 3006   9/90

payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

Form 3006   9/90

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**21. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by applicable law to Borrower and to the other persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the time required by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Form 3005  9/80

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty and without charge to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs.

23. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by applicable law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

24. **Request for Notices.** Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

26. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)]

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
| [ ] Graduated Payment Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [X] Second Home Rider |
| [ ] V.A. Rider | [ ] Other(s) [specify] | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.
Witnesses:

_____     _____ (Seal)
                                                                          -Borrower
                                     NANCY BERMAN
                                     Social Security Number ____-9465

_____     _____ (Seal)
                                                                          -Borrower
                                     Social Security Number

_____     _____ (Seal)
BRUCE BERMAN                              -Borrower
Social Security Number ____-9308     Social Security Number

State of California,                 County ss:
On this _____ day of _____           _____, before me, the undersigned, a Notary Public
in and for said State, personally appeared

known to me, or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s)  subscribed
to the foregoing instrument and acknowledged that                          executed the same.
Witness my hand and official seal.

(Reserved for official seal)         Signature _____

MR                                   _____
                                                                  Name (typed or printed)

                                     My Commission Expires: _____

effective Jan. '92
all purpose forms
to be used only.

Page 8 of 8                          Form 3005  9/90

**ALL-PURPOSE ACKNOWLEDGMENT**                                      NO 209

State of CALIFORNIA }

County of LOS ANGELES }

On Jan. 16, 1992 before me, Monica Ramos
DATE                    NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared BRUCE BERMAN and NANCY BERMAN
                    NAME(S) OF SIGNER(S)

☒ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are
subscribed to the within instrument and ac-
knowledged to me that he/she/they executed
the same in his/her/their authorized
capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s)
acted, executed the instrument.

Witness my hand and official seal.

OFFICIAL SEAL
MONICA RAMOS
Notary Public-California
LOS ANGELES COUNTY
My Commission Expires
August 3, 1993

_____
SIGNATURE OF NOTARY

**CAPACITY CLAIMED BY SIGNER**

☒ INDIVIDUAL(S)
☐ CORPORATE _____
   OFFICER(S) _____
                        TITLE(S)
☐ PARTNER(S)
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ SUBSCRIBING WITNESS
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____
_____
_____

**SIGNER IS REPRESENTING:**
NAME OF PERSON(S) OR ENTITY(IES)
_____
_____
_____
_____

ATTENTION NOTARY: Although the information requested below is OPTIONAL, it could prevent fraudulent attachment of this certificate to unauthorized document.

THIS CERTIFICATE        Title or Type of Document DEED OF TRUST
MUST BE ATTACHED        Number of Pages ___1___  Date of Document Jan. 8, 1992
TO THE DOCUMENT
DESCRIBED AT RIGHT:     Signer(s) Other Than Named Above    none

© 1991 NATIONAL NOTARY ASSOCIATION • 8236 Remmel Ave. • P.O. Box 7184 • Canoga Park, CA 91304-7184

# SECOND HOME RIDER

THIS SECOND HOME RIDER is made on this 8TH day of JANUARY 1992 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to

CrossLand Savings, FSB

(the "Lender")

of the same date and covering the property described in the Security Instrument (the "Property"), which is located at: 1355 EAST MOUNTAIN DRIVE

SANTA BARBARA, CA 93108

[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Uniform Covenant 6 of the Security Instrument is deleted and is replaced by the following:

**6. Occupancy and Use; Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy and use of the Property as a second home. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Second Home Rider.

_____ (Seal)      _____ (Seal)
BRUCE BERMAN                     -Borrower                                     -Borrower

_____ (Seal)      _____ (Seal)
NANCY BERMAN                     -Borrower                                     -Borrower

MULTISTATE SECOND HOME RIDER - Single Family - Freddie Mac UNIFORM INSTRUMENT          Form 3890 9/90
     -365 (9103)          VMP MORTGAGE FORMS - (313)293-8100 - (800)521-7291

# ADJUSTABLE RATE RIDER

LOAN #: 1666163

THIS ADJUSTABLE RATE RIDER is made this 8TH day of JANUARY , 19 92 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to CrossLand Savings, FSB (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

1355 EAST MOUNTAIN DRIVE                    SANTA BARBARA, CA 93108
(Property Address)

> THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES
> IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE
> NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST
> RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM
> RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 6.500 %. Section four of the Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of FEBRUARY , 19 93 , and on that day every 12 months thereafter. Each date on which my interest rate could change is called a "Change Date".

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the The weekly average yield on United States Treasury Securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board.
The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding THREE percentage points ( 3.000 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 8.500 % or less than 4.500 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO AND NO /100 percentage points ( 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 12.500 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER.**

Uniform Covenant 17 of the Security Instrument is amended to read as follows:

**Transfer of the property or a beneficial interest in Borrower.**  If all of any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument in acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
BRUCE BERMAN                        -Borrower

_____ (Seal)
NANCY BERMAN                        -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

This is a true certified copy of the original document on file or of record in my office. It bears the seal and signature, imprinted in purple ink of the County Clerk, Recorder and Assessor.

COUNTY CLERK, RECORDER AND ASSESSOR, SANTA BARBARA CALIFORNIA
DATE MAR 1 0 2014 _____ BY DEPUTY



# EXHIBIT E

# EXHIBIT E

# EXHIBIT E

**EXPERT'S REPORT**

**ON THE**

**DOCUMENT EXAMINATION**

**of the**

**Questioned 'Grant Deed'**

**For Randy & Evgenia Quaid**

By:

Douglas A. Cobb

April 2, 2021

PAPER FORENSICS

## 1.   INTRODUCTION & SCOPE OF WORK

This report was prepared in connection with a questioned signature on a Grant Deed dated November 11, 1991. The dispute is whether the signature of Randall R. Quaid is genuine and authored by Mr. Quaid, or if it was authored by someone else. In addition, I will examine the questioned document of any other discrepancies or anomalies.

I was retained to examine the document and give an opinion as to the authenticity of Randy R. Quaid's signature present on the questioned document, 'Grant Deed' dated November 11, 1991. In addition, to determine if there are other discrepancies within the questioned document that would point towards possible modification or fabrication. The questioned document, along with exemplars of Randy Quaid's known signature, was emailed to me, then examined at my office located in Richmond Hill, GA.

## 2.   AVAILABLE INFORMATION

The list of documents below contain "Known" documents designated with a [K1-K16] and "Questioned" (Grant Deed) document designated with a [Q1]. All of the documents listed contained the signature of Randy Quaid.

*Documents Available for Examination:*

2.1      [K1] Color scan of a stock statement dated 5-28-1981 containing Randy Quid's signature.
2.2      [K2] Photocopy of a Warner Bros Agreement containing Randy Quid's signature.
2.3      [K3] Color image of the original 1998 Corporate Tax Statement.
2.4      [K4] Color image of the original Bees 'N Honey Agreement, Signature 1.
2.5      [K5] Color image of the original Bees 'N Honey Agreement, Signature 2.
2.6      [K6] Color image of the original Bees 'N Honey Agreement, Signature 3.
2.7      [K7] Photocopy of a July 3, 1990 Carsey-Werner Company Agreement.
2.8      [K8] Photocopy of September 14, 1990 Certificate of Amendment of Articles of Incorporation.
2.9      [K9] Color image of the original 1991 Certificate of Amendment of Articles of Incorporation.
2.10     [K10] Color image of the original signature on original application form.
2.11     [K11] Photocopy of 1994 Work Authorization to work in Canada.
2.12     [K12] Photocopy of a 1995 Film Contract containing "title" and Randy Quid's signature.
2.13     [K13] Photocopy of a 1995 Film Contract containing "Artist" and Randy Quid's signature.
2.14     [K14] Color image of original June 1995 Request for Files letter.
2.15     [K15] Color image of the original 2009 Passport Application.
2.16     [K16] Photocopy of 2009 Passport.
2.17     [Q1] Photocopy of the Grant Deed dated November 11, 1991 containing the questioned signature of Randall R. Quaid.

## 3.   THE DOCUMENTS AND WRITINGS INVOLVED IN THIS EXAMINATION

The known document sets contain a combination of scanned images of original documents with "wet ink" signatures along with some photocopies. The questioned document is a certified photocopy from the Santa Barbara County Clerk, Recorder and Assessor.

## 4.   METHODOLOGY

I am a Paper Scientist and Forensic Document Examiner, I have been involved in the research, development, production and testing of various grades of paper for over 27 years.  I have been involved in the development of testing of paper and print characteristics for Hewlett Packard, Xerox, Cannon, Deluxe Check and other companies which are major suppliers of high-quality copy paper and office

2

equipment. I consult and assist Handwriting Experts and Forensic Document Examiners with examinations related to paper and paper properties. I have presented at many national and international conferences, educating Handwriting Experts and Forensic Document Examiners in the aspects of paper and print properties and how they present clues to forensic analysis.

I have been a Forensic Document Examiner for 13 years. In my forensic document analysis methodology, I follow and abide by the standards developed by professionals in the Forensic Document Examination discipline and guidelines published by the Scientific Association of Forensic Examiners (SAFE). These standards and guidelines have been thoroughly studied through extensive scientific research and validated through rigorous peer review and publication. I've applied the standards and guidelines that are applicable to the document examined in this case.

The signatures were prepared for examination by cropping them from the documents and labeled with their date and origin if known.

## 5. ANALYSIS AND DISCUSSION

I examined the "Questioned" signature on the document titled, "Grant Deed" along with sixteen samples of "Known" signatures of Randy Quaid.

Examination of the K1-K16 "Known" Signatures of Randy Quaid revealed the following:
1. The signatures supplied are both original "wet ink" and machine copies.
2. The signatures submitted exhibit a limited/normal range of variation.
3. The signature characters are not completely legible, some characters are not clearly defined.
4. Pen speed is rapid, natural and consistent.
5. Rhythm is natural, smooth and consistent.
6. The signatures exhibit little to no slant, they are signed along the signature line.
7. Height ratios of lower-case are even.
8. The heights of lower-case extenders (d) is comparable with respect to the upper-case characters.
9. Spacing of characters are tight and even.
10. Spacing of first and last name is contiguous in all but two of the samples.
11. Curvatures are smooth and without tremor.
12. The dates of the signatures range from 1981 to 2009.

Examination of the Q1 "Questioned" signature of Randy Quaid revealed the following:
1. The signature is a copy and not "wet ink".
2. Signature is signed as Randall rather than Randy.
3. The signature exhibits an abnormal range of variation.
4. The signature characters are not clearly defined, and some letters are missing.
5. Pen speed is consistent through most of the signature.
6. Rhythm is smooth except for the pen lift between the last "l" in Randall and the "R" but limited to the document being a photocopy.
7. There is a moderate upward slant in the first name Randall.
8. There is a significant downward slant in the middle initial R and last name Quaid.
9. There is an overall downward slant to the entire signature.
10. The height ratios of the capital letters are inconsistent.
11. Spacing of characters is inconsistent.
12. Curvatures are smooth.

## PAPER FORENSICS

GRANT DEED QUESTIONED DOCUMENT EXAMINATION                                APRIL 2021

**6.   EXEMPLARS OF 16 "KNOWN" AND ONE "QUESTIONED SIGNATURE OF RANDY QUAID**

K1 – 5-28-1981 Stock Statement



K2 - Warner Bros Agreement



K3 – 1988 Corporate Tax Form



K4 – 1988 Bees 'N Honey Agree. Sign. 1



K5 – 1988 Bees 'N Honey Agreement Sign. 2



K6 - 1988 Bees 'N Honey - Sign. 3



K7 – July 3, 1990



K8 – Sept. 1990 Certificate of Aendment



K9 – 1-29-1991 Certificate of Amendment



K10 - 1991 Signature on Application Form



4

GRANT DEED QUESTIONED DOCUMENT EXAMINATION                                          APRIL 2021

### K11 – 1994 Empoyment Authorization Form



### K12 – 1995 Film Contract "Title" Signature



### K13 – 1995 Film Contract "Artist" Signature



### K14 – June 1995 Request for Files



### K15 – 2009 Passport Application



### K16 – 2009 Passport



Q1 – Questioned Signature

RANDALL R. QUAID

5

GRANT DEED QUESTIONED DOCUMENT EXAMINATION                                                 APRIL 2021

Analysis of the K1-K16 "Known" and Q1, "Questioned" Signatures:

*Findings of the "Known" signatures:*

1. All "Known" signatures are horizontal, without slant and follow the signature line.
2. The "R" in Randy either touches or extends below the signature line, as indicated by the red arrows labeled 2 on the exemplars.
3. The outer portion of the loop in "d" is formed first, then the inner portion of the loop with a downward stroke. See Figure 1 below.
4. There is a unique upward stroke formed after the large loop, in place of the lower round portion of the "d", as indicated by the green arrows labeled 4 on the exemplars.
5. In all but two of the sixteen "Known" examples, the entire first and last name are contiguous or formed without a pen lift.

*Findings of the "Questioned" signature:*

1. There is an overall downward to the right slant to the signature.
2. The first name has an upward slope or slant (1). See Figure 4 below.
3. The middle initial and last name have a downward slope of slant (2). See Figure 4 below.
4. The initial downstroke in the first letter R does not meet the signature line. See Figure 4 below.
5. The only characters present in the last name are the "Q" and "d".
6. The loop in the "d" in Quaid is formed opposite to the "Known" examples, the inner portion of the loop, then the outer portion. See Figures 2 and 3 below.
7. The unique ending stroke of the "d" points downward instead of upward in all of the "Known" samples. See Figures 2 and 3 below.

The Formation of the Letter "d" in Quaid:

*Known Signature:*

This differs from the "Known" samples, as shown in the, (K3) Figure 1, example below. In all of the "Known" samples the "d" in Quaid is formed by an upstroke forming the outer loop (1), then the downward stoke (2) then the small upward line (3), which is a unique characteristic of Randy's signature.



*Figure 1, Known signature example of Randy Quaid.*

*Questioned Signature:*

Formation of the letter "d" in Quaid. There are no letters between what I believe is a Q and d. The "d" is formed by a downward stroke (1) transitioning from the Q, then the upward stoke (2) is the inside vertical of the loop, followed by the outer portion of the loop (3) then the upward stroke (4) and finally the stoke to the left and downward (5). See Figures 1 and 2 below.



*Figure 2, Questioned signature of Randall R. Quaid.*



*Figure 3, Questioned signature of Randall R. Quaid.*

<u>Slants within the Questioned Signature:</u>



*Figure 4, Questioned signature of Randall R. Quaid.*

7

There is an upward slant to the letters of the first name (Randall) (1), then a downward slant to the middle initial (R) and the last name (Quaid) (2). There is also an overall downward slope the entire signature. This is inconsistent with the "Known" sample signatures (3). See Figure 4 above.

In addition, the signature is non-contiguous as there is a pen lift between the last "l" in Randall and the "R" in R.

7. **EXAMINATION OF THE 'GRANT DEED'**
    Observations or anomalies within the 'Grant Deed' document: See Exhibit A attached to the report.
    - The document was written for Randall R. Quaid, not Randy Quaid. Mr. Quaid utilizes Randy Quaid as his legal name on documents including passports, movie contracts, the work authorization to work in Canada, and corporate legal documents.
    - Evgenia is misspelled as Eugenia.
    - The manner in which the Notary's name is written is suspicious, much of the bottom portion of her characters  appear to be flat, similar to being on a line or written with a straight edge. Examination of the original document is recommended to confirm if the Notary's name is a genuine wet-ink signature and not a "copy & paste".

8. **BASIS OF OPINION**
    The basis for handwriting identification is that writing habits are not instinctive or hereditary but are complex processes that are developed gradually through habit and that handwriting is unique to each individual. Furthermore, the basic axiom is that no one person writes exactly the same way twice and no two people write exactly the same. Thus, writing habits or individual characteristics distinguish on person's handwriting from another.

    A process of analysis, comparison and evaluation is conducted between the known/genuine standards and questioned documents. In order to establish that handwriting was or was not written by a particular person, an examination with known/genuine signatures must show substantial agreement in sufficient handwriting characteristics to identify the maker and eliminate the possibility of another writer. The handwriting characteristics that are evaluated include line quality, pressure patterns, rhythm, slant, size and proportions, utilization of space and spatial alignment, initial and terminal strokes, writing speed, legibility, skill level, letter forms, types of connectors, method of construction, and pattern formation.

    Sufficient similarities between the questioned handwriting and the exemplars help to make an identification of a writer. Any significant unexplainable fundamental difference will be sufficient to eliminate the writer.

    Based on the conclusions of the expert, an opinion will be expressed. The opinions are derived from the **S**cientific **A**ssociation of **F**orensic **E**xaminers (**SAFE**) Standards: Guide for Expressing and Reporting Opinions for Handwriting Examination.

9. **OPINION**
    Based on the documents submitted and within the bounds of reasonable scientific certainty, and subject to change if additional information becomes available, it is my professional opinion that:

8

PAPER FORENSICS

9.1     There are several noted characteristics and significant inconsistencies between the Q1 'Grant Deed' disputed Randall R. Quaid signature and the K1-K16 known handwriting exemplars of Randy Quaid. It is my professional opinion that it is **strong probability** the author of the known signatures of 'Randy Quaid' on the 'K1-K16' documents **did not author** the questioned signature of 'Randall R. Quaid' on the Q1 document.

9.2     In addition, to the questioned signature of Mr. Quaid, the authenticity of the Q1 'Grant Deed' is questionable due to the misspelling of Evgenia's name throughout the document and the questionable traits in the Notary's signature.


Douglas Cobb
Court Qualified & Certified
Paper Scientist & Forensic Paper Examiner

**Exhibit A**

RECORDING REQUESTED BY

EQUITY TITLE COMPANY

AND WHEN RECORDED MAIL THIS DEED AND, UNLESS OTHERWISE SHOWN BELOW,
MAIL TAX STATEMENTS TO:

NAME  BRUCE BERMAN
ADDRESS  7740 FLYNN RANCH ROAD
CITY &  LOS ANGELES, CA  90046
STATE

Title Order No.        Escrow No.  32030-LN

92-002539 | Sec Fee     5.00
           | SUR       10.00
Recorded   | Total      15.00
Official Records
County of
Santa Barbara
Kenneth A Pettit
Recorder
8:00am 15-Jan-92 | ETCO   BC   1
SPACE ABOVE THIS LINE FOR RECORDER'S USE

APN NO. 011-050-54

# GRANT DEED

MONUMENT SURVEY – $10.00

STAMPS AFFIXED
AFTER RECORDING

The undersigned declares that the documentary transfer tax is $ __ON REVERSE__ ____ city tax $____ and is
☒ computed on the full value of the interest or property conveyed, or is
☐ computed on the full value less the value of liens or encumbrances remaining thereon at the time of sale. The land, tenements or
realty is located in
☒ unincorporated area  ☐ city of _____

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

    RANDALL R. QUAID AND EUGENIA H. QUAID, HUSBAND AND WIFE,

hereby GRANT(S) to   BRUCE BERMAN AND NANCY BERMAN, HUSBAND AND WIFE, AS COMMUNITY PROPERTY,

the following described real property in the      UNINCORPORATED AREA OF THE
county of   SANTA BARBARA                         , state of California:

    THAT CERTAIN TRACT OF LAND IN THE COUNTY OF SANTA BARBARA, STATE OF
    CALIFORNIA, SHOWN AND DESIGNED AS PARCEL "A" ON PARCEL MAP NO. 11669,
    FILED DECEMBER 22, 1972, IN BOOK 11, PAGE 30 OF PARCEL MAPS, IN THE OFFICE
    OF THE COUNTY RECORDER OF SAID COUNTY.

Dated   NOVEMBER 11, 1991

RANDALL R. QUAID

EUGENIA H. QUAID

STATE OF CALIFORNIA
COUNTY OF   LOS ANGELES

On this the ___ day of __November__ 91 , before me,
                RANDALL R. QUAID      the undersigned Notary Public,
personally appeared
                AND EUGENIA H. QUAID

☐ personally known to me
☒ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s)  ARE      subscribed to the within
instrument and acknowledged to me that  THEY      executed the same
to  THEIR  authorized capacity(ies) and that  THEIR  signature(s)
on the instrument the person(s) or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

FOR NOTARY SEAL OR STAMP

OFFICIAL SEAL
RORI ALYSE FREED
Notary Public - California
SAN DIEGO COUNTY
My Comm Exp May 5, 1993

MAIL TAX STATEMENTS TO PARTY SHOWN ON FOLLOWING LINE: IF NO PARTY SO SHOWN, MAIL AS DIRECTED ABOVE

Name                          Street Address              City & State

ET-137 (Rev. 6-91)

# EXHIBIT F

# EXHIBIT F

# EXHIBIT F

## The CV of DOUGLAS COBB
## Paper Scientist and Forensic Document Examiner

Paper Scientist and Legal Document Expert who "understands the science of paper" and brings a unique skillset to forensic document examination. Twenty-nine years as a paper scientist and fourteen years as a paper scientist and a forensic examiner. Experienced in the development of paper grades for Hewlett Packard, Xerox, Cannon, McDonald's, Deluxe Check and other companies. Broad experience in the support, and training of forensic document examiners and other scientists about paper characteristics and security features that include fraudulent deeds, wills, business contracts/agreements and medical records. Additional expertise in surface and colloid chemistry, water chemistry, sizing, retention and fillers. Experience with many types of paper machines; including fourdrinier, twin-wire, gap formers, Yankee, TAD, cylinder and Duo-Formers, on-machine and off-machine coaters with blade and curtain coater technologies, manufacture and development of paper grades, including, printing and writing, coated and uncoated free-sheet, packaging, bleach board, food-grade, saturating kraft and tissue.

**PROFESSIONAL EXPERIENCE**

2016 to
Present

**Paper Forensics,**
*Founder and CEO*
Provide technical investigations, analysis, reports and testimony toward the resolution and litigation related to disputed documents or signatures to include wills, trusts, checks, contracts, deeds, mortgage documents, medical records, prenuptial agreements, voter registration forms and ballot cards. Investigation and analysis that includes substituted documents, dating paper, suspect documents, electronic documents, identity theft, alterations, and altered medical records or forms. Development of new science-based technologies, ScanRite Paper ID Technologies and SecureDoc5, to minimize or eliminate document fraud and improve document security. Train other forensic practitioners and scientists on the importance of paper characteristics and their impact on document forensics.

2019 to
2020

**Robson Forensic**
*Independent Contractor*
Provide technical investigations, analysis, reports and testimony toward the resolution and litigation related to disputed documents or signatures to include wills, trusts, checks, contracts, deeds, mortgage documents, medical records, prenuptial agreements, voter registration forms and ballot cards. Investigation and analysis include questioned signatures, substituted documents, dating paper, suspect documents, electronic documents, identity theft, alterations, and altered medical records or forms. Development of new science-based technologies to minimize or eliminate document fraud and improve document security. Train other forensic practitioners and scientists on the importance of paper characteristics and their impact on document forensics.

2015 to
Present

**Callahan Industries**
*Account Manager – Richmond Hill, GA*
Responsible for account management for the Southeast Atlantic Coastal Territory, covering approximately forty-five paper mills, including fourdrinier, twin-wire, gap former, TAD, Yankee, cylinder and molded pulp machines.
- Responsible for directing all consulting efforts and technical training for the production, engineering, electrical and instrumentation and technical groups within the mills.
- Coordinate all installation, service and technical activities by providing technical service, sales support, installation guides and E&I training.

- Provide technical advice in areas of consistency control, freeness control, kappa, brightness, fiber morphology and advanced process control.

| 2008 to 2017 | **Paper Private Eye** |
|---|---|

*Partner*

Provided consulting and educational services to attorneys, document examiners and handwriting experts related to paper and paper properties. Assist clients with forensic analysis, reports and testimony toward the resolution and litigation related to disputed documents that include wills, trusts, checks, contracts, deeds and mortgage documents.

2010 to 2015     **Solenis LLC**

*Sr. Territory Leader, Sr. Site Manager and Technical Sales  2008-2016 and 1996-2005*

Managed the chemical sales and technical service for multiple paper mills in several states.

- Provided technical improvements in pulp and paper processes and water chemistry through expertise in wet-end and surface-colloid chemistry and knowing their impact on paper properties and printing performance
- Extensive experience in wet-strength, dry strength, sizing, retention aids, flocculants, defoamers, softener, debonder and coating chemistries.
- Responsible for directing all sales efforts with production, engineering, electrical & instrumentation and technical groups within the mills.
- Provided process technical direction and instruction to mills in the areas of retention and wet-end chemical optimization, strength and fiber development, print performance and cost reduction.
- Assisted mills with the development of new food-grade, packaging, pulp and printer paper grades, including 100% Surface Size within Boise Cascade.

2005 to 2008     *Senior Plant Engineer*                        *2005-2008*

*Sr.Engineer – Louisiana, MO*

- Project Manager for $25 million expansion of Synlubes synthetic lubrication plant, managed the construction contractor, oversaw construction, selection and installation of equipment.
- Assisted with the development and scale-up of a new process and DCS control system that included writing several process procedures and operating manuals.
- Provided process engineering and technical services for the manufacture of formaldehyde, fertilizer, pentaerythritol and synthetic lubricants.
- Assisted and management of Synlubes Plant operators.
- Utilized chemical engineering methodologies to solve quality issues with products manufactured in the plant. These methodologies included identifying the relationship between the cooling temperature and lime addition during the acid neutralization process that subsequently resolved the long-time issue of excess residual acid in the synthetic lubricant that is used in most commercial airplanes that is supplied to AirBP, the aeronautical division of British Petroleum.

1993 to 1996     **Boise Cascade Corporation**

*Process and Production Engineer & Product Development*

Held positions of process and production engineering positions at the International Falls, MN Mill for four paper machines producing nearly 3000 tons of paper per day.

- Assisted with Xerox and Hewlett Packard development, production and qualification of printing and writing grades utilizing Design of Experiments that included paper

    testing and the implementation of customer specification verification through statistical process controls.
- Developed barrier coatings, including oil and grease resistance of food packaging grades for the International Falls, Minnesota and Vancouver, Washington Paper Mills. Customers included McDonalds.
- Developed security paper grades for Deluxe Check.

**EDUCATION**

    B.S. Forest Products, Specialization in Paper Science and Engineering, University of Minnesota, Saint Paul, Minnesota, 1993

    Associate Degree,  Service Electronics, Willmar Vocational-Technical Institute, Willmar, Minnesota, 1979

    *Continuing education:*
    SAFE, Scientific Association of Forensic Examiners, 2019-Present, month training.
    AHWT Leadership Training, Jacksonville, FL, 2008
    Consultative Selling, Wilmington, DE, 2007
    ISO 9001 Internal Auditing, 2006
    Situational Sales Negotiation, Jacksonville, FL, 2006
    Kepner-Tregoe Project Management, Wilmington, DE, 2002
    Zenger Miller, Self-directed Work Team Training, Biloxi, MS, 1999
    Kepner-Tregoe Problem Solving & Decision Making, International Falls, MN, 1996
    Entec Process Dynamics & Control, International Falls, MN, 1995
    Clariant Paper Color School, Charlotte, NC, 1995
    QualPro Statistical Methods, International Fall, MN, 1994

**PROFESSIONAL MEMBERSHIPS**

    SAFE, Scientific Association of Forensic Examiners
    ACFE, Association of Certified Forensic Examiner

**PUBLICATIONS**

    Cobb, D., The Color Spectrophotometer and the Examination of Questioned Documents, NADE Annual Journal, 2019
    Cobb, D., Variability Within Purchased Wood Chips, Minnesota Academy of Science Journal, 1993

**TESTIMONY & DEPOSITIONS**

    *Testimony*
    Heritage Capital Group, Inc. vs Former US Blades, LLC, Case No. 16-2019-CA-522, Circuit Court of 4th Judicial Circuit, Duval Co. FL, August 2020

    Valerie Zamberletti vs Maria E. Amplatz, Case No. 27-CV-20-5136, District Court, 4th Judicial District, State of Minnesota, County of Hennepin, February 2021

    *Deposition*
    John Mark Wilhite vs No. 57216, Division B Patti Sue Wilhite, Monroe, LA, January 2021

    Sharon Ramsey (Mary Pettway) vs Birmingham Nursing & Rehabilitation Center, February 2021

# EXHIBIT G

# EXHIBIT G

# EXHIBIT G



To Whom It May Concern:

   We regret to report that after a thorough examination of your recently submitted autograph(s) we are unable to certify its legitimacy.

   It is our considered opinion that the submitted item is not, in fact, an authentic example. Several factors became apparent during our inclusive examination that prevented us from certifying the autographed item. The apparent results of these inconsistencies are as follows:

   1) Atypical letter slant, angle, and/or pitch

   2) Irregular letter shape and/or formation

   3) Irregular overlapping of strokes

   4) Irregular spacing between letters

   5) Lacks spontaneity, rhythm, conviction, and/or movement

   6) Sizing of letters Disproportionate/Exaggerated/Undersized

Based on the set of digital exemplars & documents supplied to us by the submitter, we've identified numerous inconsistencies that prevent us from authenticating the questioned signature (JSA has not seen the original document).

   On behalf of James Spence Authentication, we have opined this conclusion based on our extensive working comprehension and involvement with the autograph memorabilia hobby, expertise in the area of autograph analysis, and our acknowledged professional experience.

   We appreciate your consideration of entrusting James Spence Authentication's judgment and look forward to examining additional collectibles for you in the near future.

Autographically Yours,

James J. Spence, Jr.
President, Founder, & Owner
James Spence Authentication, LLC

**Submission Number:** W155220
**Date:** Monday, November 11, 2019
**Subject:** Evgenia (Evi) Quaid
**Field:** Entertainment
**Description:** Signed Document
**Type:** Grant Deed
**Dated:** November 11, 1991 (Document)
**# of Signatures:** 1
**Location:** Page 2

RANDALL R. QUAID

EVGENIA R. QUAID

**New Jersey Office**
2 Sylvan Way, Suite 102
Parsippany, NJ 07054
973-898-1300 • Info@SpenceLOA.com

**www.SpenceLOA.com**

**Florida Office**
3223 N.W. 10th Terrace, Suite 604
Fort Lauderdale, FL 33309
954-380-8670 • Florida@SpenceLOA.com

GRANT DEED QUESTIONED DOCUMENT EXAMINATION                                           APRIL 2021

**Exhibit A**



RECORDING REQUESTED BY

**EQUITY TITLE COMPANY**

AND WHEN RECORDED MAIL THIS DEED AND , UNLESS OTHERWISE SHOWN BELOW, MAIL TAX STATEMENTS TO:

NAME: BRUCE BERMAN
ADDRESS: 7740 FLYNN RANCH ROAD
CITY & STATE: LOS ANGELES, CA 90046

Title Order No. _____ Escrow No. 32030-LN

92-002539    Rec Fee    5.00
             SUR       10.00
             Total      15.00
Recorded
Official Records
County of
Santa Barbara
Kenneth A Pettit
Recorder
8:00am 15-Jan-92    ETCO    BC    1
SPACE ABOVE THIS LINE FOR RECORDER'S USE

APN NO. 011-030-54

# GRANT DEED

**MONUMENT SURVEY - $10.00**

STAMPS AFFIXED
AFTER RECORDING

The undersigned declares that the documentary transfer tax is $ **ON REVERSE** _____ city tax $ _____ and is
[X] computed on the full value of the interest or property conveyed, or is
[ ] computed on the full value less the value of liens or encumbrances remaining thereon at the time of sale. The land, tenements or realty is located in
[X] unincorporated area  [ ] city of _____

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

RANDALL R. QUAID AND EUGENIA H. QUAID, HUSBAND AND WIFE,

hereby GRANT(S) to   BRUCE BERMAN AND NANCY BERMAN, HUSBAND AND WIFE, AS COMMUNITY PROPERTY,

the following described real property in the   UNINCORPORATED AREA OF THE
county of   SANTA BARBARA                    , state of California:

THAT CERTAIN TRACT OF LAND IN THE COUNTY OF SANTA BARBARA, STATE OF
CALIFORNIA, SHOWN AND DESIGNED AS PARCEL "A" ON PARCEL MAP NO. 11669,
FILED DECEMBER 22, 1972, IN BOOK 11, PAGE 30 OF PARCEL MAPS, IN THE OFFICE
OF THE COUNTY RECORDER OF SAID COUNTY.

Dated   NOVEMBER 11, 1991

STATE OF CALIFORNIA
COUNTY OF   LOS ANGELES

On this the ____ day of __November__ 91 , before me,
_____ RANDALL R. QUAID _____ undersigned Notary Public,
personally appeared
_____ AND EUGENIA H. QUAID
[ ] personally known to me
[X] proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) ___ARE___ subscribed to the within
instrument and acknowledged to me that ___THEY___ executed the same
In ___THEIR___ authorized capacity(ies) and that by ___THEIR___ signature(s)
on the instrument the person(s) or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_____ Notary's Signature

RANDALL R. QUAID

Eugenia H. QUAID

FOR NOTARY SEAL OR STAMP

OFFICIAL SEAL
RON ALYSE FREED
Notary Public - California
SAN DIEGO COUNTY
My Comm. Exp. May 8, 1993

MAIL TAX STATEMENTS TO PARTY SHOWN ON FOLLOWING LINE: IF NO PARTY SO SHOWN, MAIL AS DIRECTED ABOVE

Name                     Street Address              City & State

ET-137  (Rev. 6-91)

10

## PAPER FORENSICS

# EXHIBIT H

# EXHIBIT H

# EXHIBIT H

Case 2:21-cv-04793-CBM-JPR   Document 1   Filed 06/11/21   Page 64 of 68   Page ID #:64 4/7/21, 10:08 AM

# STATE OF CALIFORNIA
# DEPARTMENT OF REAL ESTATE

In reviewing a licensee�s information, please be aware that license discipline information may have been removed from a licensee�s record pursuant to Business & Professions Code Section 10083.2 (c). However, discipline information may be available from the California Department of Real Estate upon submittal of a request, or by calling the Department�s public information line at 1-877-373-4542.
The license information shown below represents public information. It will not reflect pending licensing changes which are being reviewed for subsequent updating. Although the business and mailing addresses of real estate licensees are included, this information is not intended for mass mailing purposes.
Some historical disciplinary action documents may not be in compliance with certain accessibility functions. For assistance with these documents, please contact the Department's Licensing Flag Section.

License information taken from records of the Department of Real Estate on 4/7/2021 6:33:37 AM

| | |
|---|---|
| **License Type:** | CORPORATION |
| **Name:** | SMS Trust Deed Service |
| **Mailing Address:** | 3160 AIRWAY AVENUE<br>COSTA MESA, CA 92626 |
| **License ID:** | 00865309 |
| **Expiration Date:** | 05/21/88 |
| **License Status:** | EXPIRED |
| **Corporation License Issued:** | 05/22/84 (Unofficial -- taken from secondary records) |
| **Former Name(s):** | NO FORMER NAMES |
| **Main Office:** | NO CURRENT MAIN OFFICE ADDRESS ON FILE |
| **Licensed Officer(s):** | DESIGNATED OFFICER<br>00658190 - Expiration Date: 05/21/88<br>Hunter, David C<br>OFFICER LICENSE EXPIRED AS OF 05/22/88<br><br>00640820 - Expiration Date: 05/21/88<br>Young, Judith Lucille<br>OFFICER LICENSE EXPIRED AS OF 05/22/88 |
| **DBA** | SMS Mortgage Servicing<br>ACTIVE FROM 05/22/1984 TO 08/09/1985<br><br>NO CURRENT DBAS |
| **Branches:** | NO CURRENT BRANCHES |
| **Comment:** | NO DISCIPLINARY ACTION<br><br>NO OTHER PUBLIC COMMENTS |

# EXHIBIT I

# EXHIBIT I

# EXHIBIT I

RECORDING REQUESTED BY
LAND AMERICA/LAWYERS TITLE

2007-0060403

RECORDING REQUESTED BY
Lawyers Title Company
WHEN RECORDED MAIL THIS DOCUMENT
AND TAX STATEMENTS TO:
R. Scott Turicchi
Lannette C. Turicchi

1355 E. Mountain Dr.
Santa Barbara, CA 93108

| Recorded | REC FEE | 7.00 |
| Official Records | | |
| County of | SURVEY MONUMENT 10.00 |
| Santa Barbara | | |
| Joseph E. Holland | | |
| | | AN |
| 08:05AM 21-Aug-2007 | Page 1 of 1 | |

APN: 011-050-54
Escrow No: 04101724-401-CJF
Title No: 04101724

Space above this line for Recorder's use

**GRANT DEED**

MONUMENT SURVEY $10.00

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
DOCUMENTARY TRANSFER TAX IS NOT MADE PART OF THE PUBLIC RECORD
computed on full value of property conveyed,
unincorporated area, AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

Bruce Berman and Nancy Goligar Berman, husband and wife as community property

hereby GRANT(S) to

R. Scott Turicchi and Lannette C. Turicchi, husband and wife, as community property with right of
survivorship

the following described real property in the County of Santa Barbara, State of California:
All that certain real property situated in the County of Santa Barbara, State of California, described as follows:

Parcel "A" of Parcel Map No. 11669 in the County of Santa Barbara, State of California, as shown on the map filed
in Book 11, Page 30 of Parcel Maps, in the office of the County Recorder of said County.

Commonly known as: 1355 East Mountain Drive, Santa Barbara, CA 93108

Dated: July 6, 2007

| TRANSFER TAX NOT MADE PART |
| OF THE PERMANENT RECORD |

Bruce Berman

Nancy Goligar Berman

STATE OF CALIFORNIA
COUNTY OF Los Angeles } SS:

On 6th day of July, 2007, before me, Brenda Joyce Hunter, a Notary Public,
personally appeared Bruce Berman and Nancy Goligar Berman whose name(s) is/are
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature Brenda Joyce Hunter

BRENDA JOYCE HUNTER
Comm. #1626840
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires September 18, 2009

FOR NOTARY SEAL OR STAMP

MAIL TAX STATEMENTS AS DIRECTED ABOVE

This is a true certified copy of the
original document on file or of record in
my office. It bears the seal and
signature, imprinted in purple ink, of the
County Clerk, Recorder and Assessor.

Joseph E. Holland

COUNTY CLERK, RECORDER AND ASSESSOR, SANTA BARBARA, CALIFORNIA
DATE   JUN 0 5 2015   BY DEPUTY

# EXHIBIT J

# EXHIBIT J

# EXHIBIT J

Dear Mr. and Ms. Turucchi,

You are trespassing.
You must vacate immediately.
Please leave our keys in our mailbox along with our remote gate opener.

We never sold you the property. We were never paid. We find it difficult to believe that you agreed to enter into such a shady purchase agreement for our property without knowledge of who the actual owners were.

Our position is that you and your spouse are involved in this scam to defraud us and we are going to proceed with prosecuting you for your role in this deceit and for taking equity out of a property that didn't belong to you. We were nearly killed as a result of your complicity. If you are innocent it is up to you to prove your innocence to us.

You both must have known or feared this day would arrive. This is what happens when you purchase a house from someone who doesn't own it. I would suggest you have a very good lawsuit against Bruce Berman and your realtor. I know we do from lost investment opportunities, lost appreciation, increased cost, adverse taxes, attorneys' fees, slander, reputation interference and attempted murder.

We will also require you to immediately return to us any of our equity you may have pulled out of the house and the names of any third parties you may have shared it with. At this point WE are not pursuing YOU and your husband for pain and suffering or slander or interference with prospective advantage, attempted murder, fraud or contract interference, etc.

Mr. and Mrs. Randy Quaid
and All Corporations